Lucius P. JOE and Marva
L. Joe, Appellants,

v.

Billy J. PARKHILL, M.D., Appellee.

No. 06–00–00116–CV.

Court of Appeals of Texas,
Texarkana.

Submitted Oct. 18, 2001.

Decided Nov. 15, 2001.

Michael D. Mosher, Law Office of Michael D. Mosher, Paris, for appellants.

Joel J. Steed, C. Timothy Reynolds, Law Offices of Joel J. Steed, PC, Dallas, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

DONALD R. ROSS, Justice.

Lucius and Marva Joe appeal the trial court's judgment in favor of Billy Parkhill, M.D. The Joes sued Parkhill alleging he was negligent in failing to recognize complications resulting from an arteriogram and angioplasty procedure Parkhill performed on Lucius' left renal artery. The Joes further alleged that, as a result of Parkhill's negligence, Lucius' right renal artery became blocked and his right kidney failed, eventually leading to its removal and his having to undergo dialysis treatments. The case was tried to a jury, which found in favor of Parkhill. The trial court rendered judgment accordingly.

On appeal, the Joes contend there was factually insufficient evidence for the jury to find in favor of Parkhill. When a party attacks the factual sufficiency of an adverse finding on an issue on which that party had the burden of proof, he or she must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001). We consider and weigh all of the evidence and set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

Lucius testified he noticed blood in his urine sometime in 1997. He consulted his primary care physician, Melvin Jackson, M.D., a doctor of internal medicine, who referred him to a urologist. The urologist discovered a blockage in Lucius' left renal artery and recommended he undergo a renal arteriogram and angioplasty for placement of a stent in the artery.

A renal arteriogram is a procedure in which dye is introduced into the abdominal area and images are taken to allow the radiologist to assess the condition of the renal arteries, the position of the kidneys, and the flow of blood to the kidneys. Angioplasty is a procedure in which a balloon catheter is inserted through the blocked portion of an artery and the balloon expanded to increase blood flow through the artery. Often a stent will be placed in the artery to prevent subsequent blockage.

To perform these procedures, the urologist referred Lucius to Parkhill. Parkhill is an interventional radiologist, a subspecialty of radiology in which the radiologist performs certain invasive treatment procedures aided by imaging tools (e.g., x-rays, ultrasound, MRIs, CAT scans, etc.). Parkhill testified he performed renal artery angioplasties in his residency from 1978 to 1982, but did not perform the procedure in his private practice until 1992. He testified that, from 1992 to April 1997, the date of Lucius' angioplasty, he performed three other renal artery angio-

plasties, the latest one occurring about a year before Lucius' angioplasty.[1]

Parkhill testified that he used a fluoroscope, which is an x-ray beam projected onto a receptor, to transmit real-time images to a television monitor. He also testified he viewed static digital images of the procedure on a separate computer monitor and was able to adjust the contrast and brightness of these images. However, he testified these digital images also contain visual distortions, i.e., things that appear on the monitor or on a hard-copy image that are not actually there.

Parkhill testified he made four separate runs, or injections of dye and viewing of images, each from slightly different angles and magnifications. In each run, he viewed the real-time images and between fourteen and seventeen static digital images, a smaller number of which were reduced to hard copies and introduced into evidence. He testified, however, that he did not make a run at the end of the procedure.

The parties agree Lucius' was a very difficult procedure. There was testimony that Lucius exhibited a 95% to 98% blockage of his left renal artery and a 75% to 90% blockage of his right renal artery. Parkhill testified he was unable to cross the blockage in the left renal artery with the balloon catheter because the plaque blocking the artery was too tough to be crossed. Thus, he could not successfully complete the angioplasty. In a progress note written shortly after the procedure, Parkhill noted there were no complications from the procedure.

After Lucius was returned to his hospital room, his blood pressure began to spike. The procedure began at 1:00 p.m. and ended at 2:25 p.m. Lucius' blood pressure at 12:45 p.m. was $204/96$. Marva testified her husband's blood pressure spiked at around 3:15 p.m. to $260/130$. In contrast, Parkhill introduced into evidence hospital records showing Lucius' blood pressure was $210/100$ at 3:00 p.m., $210/110$ at 3:45 p.m., and $268/130$ at 4:15 p.m.

Lucius was moved to the intensive care unit (ICU) at 5:00 p.m. He began to experience nausea, vomiting, flank pain, and cessation of urine output. He was later transferred to Baylor Medical Center in Dallas. About five days later, the doctors at Baylor concluded Lucius' right renal artery was completely blocked. They performed exploratory surgery, did a bypass on his left renal artery, and removed his right kidney, which was no longer functioning.

William Shutze, M.D., the surgeon at Baylor who performed the bypass of Lucius' left renal artery and removed his right kidney, testified that in his opinion the right renal artery became blocked as a result of the procedure performed by Parkhill. He acknowledged, however, that he was not offering an opinion regarding whether Parkhill was negligent, that he could not state with certainty when the artery became blocked, and that the specialists who cared for Lucius after the procedure should have been able to recognize the clinical signs of a blocked renal artery.

Michael Rothkopf, M.D., the Joes' expert witness, testified that, during the attempted angioplasty, Parkhill's manipulation of the catheter inadvertently pushed

---

1. The Joes also contend Parkhill was negligent for failing to inform them that he had not performed a renal artery angioplasty in over a year. However, Michael Rothkopf, M.D., the Joes' expert witness, testified that, while he might defer a difficult case like Lucius' to another doctor if he had not done a lot of renal angioplasties, "it's okay to do it if you think you can."

plaque into the right renal artery, which caused it to become completely blocked. He pointed to hard-copy images made at the beginning of the procedure, which he testified showed blood flowing through the right renal artery, and to hard-copy images made fifteen minutes into the procedure, which he testified showed clots at the opening of the right renal artery that disrupted blood flow. He testified that Lucius' clinical condition following the procedure—his spike in blood pressure, nausea and vomiting, flank pain, and cessation of urine output—would have alerted a reasonably prudent physician performing this procedure that Lucius' renal artery was blocked.

Rothkopf testified Parkhill was not negligent for causing the obstruction in Lucius' right renal artery, but testified Parkhill was negligent for failing to recognize Lucius' condition and its probable cause both during and after the procedure. He also testified Parkhill was negligent for failing to accurately report the existence of complications to the other doctors who assumed Lucius' care after the procedure.

Rothkopf conceded, however, that the hard-copy image did not show a complete blockage. He further conceded that, if Parkhill did not see any complications as a result of the procedure, he would not be acting below the standard of reasonable medical practice if, after the procedure, he turned Lucius' care over to other doctors familiar with kidney problems. Rothkopf admitted that Jackson was charged with Lucius' care after the procedure; that Jackson consulted a nephrologist (a kidney specialist) and a cardiologist when Lucius' condition worsened; that internists, nephrologists, and cardiologists are qualified to diagnose and treat kidney problems; and that Parkhill was not notified of Lucius' post-procedure clinical condition.

While Parkhill conceded the right renal artery probably became at least partially blocked as a result of the angioplasty procedure, he disputed the blockage began to form while the procedure was in progress. Rather, he contended the blockage formed slowly after the procedure. He testified the real-time fluoroscopy and the static digital images he reviewed at the end of the procedure convinced him there was blood flow through both renal arteries.

Parkhill disputed Rothkopf's interpretation of the hard-copy image made fifteen minutes into the procedure. Specifically, he observed that the opening of the right renal artery was not even observable on the hard-copy image, even though Rothkopf testified the image showed a blockage there. Further, he testified a blockage could not have been present because the hard-copy image showed dye flowing through the artery, which would have been impossible had the artery been blocked. He testified that the anomalies Rothkopf observed were either visual distortions or normal turbulence from blood flow because, if they were not, he would have seen them on the real-time fluoroscopy or the static digital images during the procedure. He further observed that Lucius' medical records from Baylor showed that the doctors there, reviewing the same hard-copy image, did not note a blockage of the right renal artery.

Parkhill also testified Lucius' post-procedure care was properly entrusted to Jackson, who consulted with specialists qualified to address the complications Lucius experienced. In fact, he testified he would not have been qualified to treat Lucius' condition as it developed after the procedure.

In addition, Ronald Gensburg, M.D., one of Parkhill's expert witnesses, testified it was impossible to know with certainty what the anomalies Rothkopf identified on

the hard-copy image were. Rather, he testified that a doctor performing the angioplasty would have to review the real-time fluoroscopy and all the static digital images to assess the patient's condition, rather than relying on a single image.

Gensburg testified that in his opinion the hard-copy image did not depict a blockage of the right renal artery because there was still dye flowing through. However, he testified that, even if Rothkopf was correct that the hard-copy image showed a blockage of the right renal artery, Parkhill would not necessarily be negligent for failing to see it during the procedure because of the minute details present on each image.

Bruce Baker, M.D., another expert called by Parkhill, testified a blockage to the right renal artery resulting from an angioplasty on the left renal artery is an unlikely complication. He testified that Rothkopf's testimony—that Lucius' right renal artery became blocked by dislodged plaque—was not supported by the pathology report, which showed there was no plaque in the right renal artery.

The Joes contend the jury's verdict was against the great weight and preponderance of the evidence. Specifically, they contend the evidence shows that Parkhill's failure to recognize and report that Lucius' right renal artery became blocked during the arteriogram and angioplasty led to the loss of his right kidney. However, Parkhill presented testimony that the right renal artery was not blocked at the end of the procedure. He testified he reviewed the real-time fluoroscopy and the static digital images, and was convinced there was blood flow through both arteries at the end of the procedure.

The Joes point to Rothkopf's testimony that the blockage was evident on the hard-copy image taken fifteen minutes into the procedure. However, both Parkhill and Gensburg disputed that the hard-copy image showed a blockage. Rather, they testified the anomalies present on the hard-copy image could be visual distortions or turbulence from blood flow, but that in any event it was impossible to determine anything from a single image. Baker testified the pathology report showed no plaque present in the right renal artery.

The Joes also contend the evidence shows that Parkhill's failure to check on Lucius after the procedure and Parkhill's failure to entrust Lucius' care to doctors experienced in treating kidney problems led to the loss of Lucius' kidney. However, Rothkopf, the Joes' own expert, testified that Parkhill would not be negligent if he did not see any complications after the procedure and entrusted Lucius' care to other competent doctors. As already mentioned, Parkhill testified he saw no complications at the end of the procedure and the jury did not find him negligent. Rothkopf and Shutze both testified that an internist, nephrologist, or cardiologist would be capable of treating kidney problems, and there was no evidence showing the doctors who actually treated Lucius after the procedure were unqualified or incompetent to treat him. Therefore, the jury's finding in favor of Parkhill is not against the great weight and preponderance of the evidence.

The judgment is affirmed.